CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 1     Case 1:26-cv-06142     Document 1-1     Filed 07/20/26     Page 1 of 44

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 06/25/2026

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-------------------------------------------------------------------------X

JANE DOE 1 and JANE DOE 2,

                    **Plaintiffs,**

-against-

RICHARD D. KAHN and DARREN K.
INDYKE, in their capacities as the co-executors
of the ESTATE OF JEFFREY EDWARD
EPSTEIN, LESLIE HERBERT WEXNER.
NINE EAST 71ST STREET CORPORATION
and THE WEXNER FOUNDATION,

                    **Defendants.**

-------------------------------------------------------------------------X

**Index No.:**

**SUMMONS**

**VENUE**
**New York County**

**BASIS FOR VENUE**
**The location where a**
**substantial part of the**
**events to these claims**
**occurred**

**TO THE ABOVE-NAMED DEFENDANT(S):**

    **YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiff's attorney, an

answer to the complaint in this action within twenty (20) days after the service of this summons,

exclusive of the day of service (or within thirty [30] days after the service is complete if this

summons is not personally delivered to you within the State of New York); and, in case of your

failure to appear or answer, judgment will be taken against you by default for the relief demanded

in the complaint.

Dated:  New York, New York
       June 25, 2026

**GODDARD LAW PLLC**
*Attorneys for Plaintiffs*

By: _____

**Lindsay M. Goldbrum, Esq.**
**Megan S. Goddard, Esq.**
**Hailey Miller, Esq.**
**39 Broadway, Suite 1540**
**New York, New York 10006**
Lindsay@goddardlawnyc.com
Megan@goddardlawnyc.com
Hailey@goddardlawnyc.com

**EXHIBIT**

**A**

1

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 1    Case 1:26-cv-06142    Document 1-1    Filed 07/20/26    Page 2 of 44    INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 06/25/2026

TO:    **RICHARD D. KAHN, in his capacity as a co-executor of the ESTATE OF JEFFREY EDWARD EPSTEIN**

575 Lexington Avenue, 4th Floor
New York, New York 10022

130 East 75th Street, #7E
New York, NY 10021

**DARREN K. INDYKE, in his capacity as a co-executor of the ESTATE OF JEFFREY EDWARD EPSTEIN**

575 Lexington Avenue, 4th Floor
New York, New York 10022

16065 Bristol Isle Way
Delray Beach, FL 33446

**LESLIE HERBERT WEXNER**

4500 Kitzmiller Road
New Albany, OH 43054

**NINE EAST 71ST STREET CORPORATION**

575 Lexington Avenue, 4th Floor
New York, NY 10022

9 E. 71st Street
New York, NY 10021

**THE WEXNER FOUNDATION**

60 E 42nd Street, #1700
New York, NY 10165

551 Madison Avenue, 9th Floor
New York, NY 10022

2

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X
JANE DOE 1 and JANE DOE 2,                                         Index No.:

                                    Plaintiffs,        **COMPLAINT**
                                                       *Jury Trial Demanded*
            -against-

RICHARD D. KAHN and DARREN K.
INDYKE, in their capacities as the co-executors
of the ESTATE OF JEFFREY EDWARD
EPSTEIN, LESLIE HERBERT WEXNER.
NINE EAST 71ST STREET CORPORATION
and THE WEXNER FOUNDATION,

                                    Defendants.
------------------------------------------------------------------X

Plaintiffs Jane Doe 1 and Jane Doe 2 (together, "Plaintiffs") hereby allege, as and for their

Complaint against Defendants Richard D. Kahn and Darren K. Indyke, in their capacities as co-

executors of the Estate of Jeffrey Edward Epstein, Leslie Herbert Wexner, Nine East 71st Street

Corporation, and The Wexner Foundation (together, "Defendants"), as follows:

## PRELIMINARY  STATEMENT

1.      Jeffrey Epstein was a prolific sexual abuser of children. He did not act alone. He

could not have. The sexual abuse of children on the scale that Epstein carried out – across state

lines, across international borders, and over decades – required money, property, staff, aircraft,

and the deliberate silence of those who enabled him. This case is about the lives of two children

he intentionally destroyed, and the innocence Jeffrey Epstein stole from those children.  But this

case, like all of the cases involving Jeffrey Epstein, has more than one bad guy-this case is also

about holding the people who profited from the suffering of those two children and from the

suffering of an unimaginable number of other children.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(1)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1

Case 1:26-cv-06142     Document 1-1     Filed 07/20/26     Page 4 of 44

RECEIVED NYSCEF: 06/25/2026

2.      In 2004, Jane Doe 1 and Jane Doe 2 were seventeen-year-old high school students attending Rudolf Steiner High School in New York City. Jane Doe 2 entered the country from Peru on an R-2 visa and was attending the school on scholarship. Both were minors and both were focused on their futures, meeting with college counselors and dreaming about the opportunities that lay ahead.

3.      Like many teenagers, Jane Doe 1 and Jane Doe 2 wanted financial independence. They wanted to be able to buy their own things without relying on their parents. When Jane Doe 1 was approached by a friend and neighbor who told her about an easy way to make money by giving massages to a wealthy man, she believed it. She had no reason not to. She was seventeen years old. Jane Doe 1 then told her friend, Jane Doe 2, about the massage job.

4.      What Jane Doe 1 and Jane Doe 2 did not know was that they were being recruited into Jeffrey Epstein's sex trafficking operation. They did not know that the promised "massage" job was a lie. They did not know that they would be sexually assaulted, or that the wealthy man who claimed he could help with their futures would instead destroy their sense of safety and leave them with trauma that would last for decades.

5.      The assaults took place at Epstein's Manhattan residence located at 9 East 71st Street, a 28,000-square-foot mansion that Epstein did not own and could never have afforded on his own. The property belonged to Defendant Leslie Herbert Wexner, who purchased it in 1989 and later transferred it to Epstein for a fraction of its value. Wexner never lived there. Instead, he allowed Epstein to use it as the site where he sexually exploited young women and girls, including Jane Doe 1 and Jane Doe 2.

2

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 06/25/2026

6.      Appointments at the mansion were arranged through a systematic process. Girls were given a phone number for "Leslie," one of Epstein's assistants. They would call, provide their name, say they wanted to see Epstein, and receive a callback with a scheduled date and time. More than twenty years later, Jane Doe 1 still has that phone number written in her homework binder from high school.



7.      The same number appears throughout the Epstein files released by the Department of Justice, confirming the organized nature of Epstein's operation and the infrastructure that supported it.

8.      When Jane Doe 1 and Jane Doe 2 arrived at 9 East 71st Street, they were greeted by household staff who escorted them into the mansion. They were brought to a massage room where Epstein sexually assaulted them. While Jane Doe 1 massaged Epstein with baby oil, he stuck his hand into her underwear and digitally penetrated her without her consent. When she fled to the bathroom in tears, Epstein became enraged and demanded that she finish. In subsequent visits to the home, Epstein fondled her breasts and groped her genitals, all without her consent.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5(d)) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1    Case 1:26-cv-06142    Document 1-1    Filed 07/20/26    Page 6 of 44    RECEIVED NYSCEF: 06/25/2026

9.      Jane Doe 2 was similarly assaulted, forced to engage in sexual contact with Epstein by massaging his penis along with other girls while he touched their breasts and genitals without their consent. Both girls left the mansion traumatized, paid for their silence, and forever changed.

10.      Jeffrey Epstein's ability to perpetrate these crimes was not the result of his own wealth or ingenuity. Epstein was fired as a high school math teacher because he "didn't come up to snuff" before he met Leslie Wexner. Beginning in 1991, Defendant Wexner gave Epstein full power of attorney over his personal finances, enabling Epstein to control hundreds of millions of dollars with virtually no oversight. Between 1987 and 2007, Wexner provided Epstein with approximately $200 million or more. Wexner also gave Epstein the Manhattan townhouse where Jane Doe 1 and Jane Doe 2 were assaulted, a private Boeing 727 jet used to transport victims, and positions of authority within Defendant The Wexner Foundation that conferred institutional legitimacy. Epstein served as a trustee and director of the Foundation and as Chief Executive Officer of Defendant Nine East 71st Street Corporation, the entity created to hold the property where the abuse occurred.

11.      Without Leslie Wexner's money, without his property, and without the power and prestige that came from his association with one of the wealthiest men in America, Jeffrey Epstein would never have been able to operate a sex trafficking network. He would not have had the resources to recruit vulnerable young girls, to maintain a mansion staffed with employees who facilitated abuse, or to create the appearance of legitimacy that disarmed his victims.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



12.    There would be no Epstein without Les Wexner. As U.S. Congressman Robert Garcia stated on February 18, 2026, after Leslie Wexner's congressional deposition: "We should be very clear that there would be no Epstein island, there would be no Epstein plane, there would be no money to traffic women and girls, Mr. Epstein would not be the wealthy man he was without the support of Les Wexner." This case demonstrates the truth of that statement. Jeffrey Epstein's systematic sexual exploitation of Jane Doe 1 and Jane Doe 2 was made possible by the financial resources, real property, and institutional legitimacy provided to him by Leslie Herbert Wexner and his corporate entities.

13.    For years, Jane Doe 1 and Jane Doe 2 believed they had no legal recourse. They were too embarrassed, then as they got older, they thought he was too powerful, and later, that too much time had passed. They were forced to live in silence with the trauma of what had been done to them when they were children.

14.    The New York City Council's recent enactment of Introduction 1297-A, which amended the Gender-Motivated Violence Protection Act, has opened an eighteen-month window for survivors of gender-motivated violence to seek justice even when their claims would have

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(1)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

previously been time-barred. This amendment became effective on January 29, 2026, and it provides Jane Doe 1 and Jane Doe 2 with the opportunity they were previously denied: the chance to seek accountability not only from Jeffrey Epstein's estate, but also the individuals and entities that enabled his crimes.

15.     Plaintiffs bring this action to seek justice for what was taken from them when they were seventeen years old. Nothing can undo the profound harm inflicted on them or restore what they lost. But they seek to hold accountable the Defendants who made Jeffrey Epstein's operation possible, who provided the resources and property he used to commit these crimes, and who profited from or facilitated a system of abuse that destroyed the lives of countless young women and girls.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this matter pursuant to New York Civil Practice Laws and Rules ("CPLR") § 301.

17.     This Court has personal jurisdiction over Defendants pursuant to CPLR §§ 301 and 302. Jeffrey Epstein maintained property and operations in New York County, including at 9 East 71st Street where the abuse occurred. Defendant Leslie Herbert Wexner transacted business in New York, owned and controlled property in New York County, and exercised control over New York-based corporate entities including Defendants Nine East 71st Street Corporation and The Wexner Foundation. Defendants Nine East 71st Street Corporation and The Wexner Foundation are New York corporations with principal places of business in New York County.

18.     Venue is proper in New York County pursuant to CPLR § 503(a) because the events giving rise to the claims occurred in New York County at 9 East 71st Street, New York, New York.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

19.     This action is timely filed pursuant to the New York City Gender-Motivated Violence Protection Act (NYC Admin. Code § 10-1101 et seq.), as amended by Introduction 1297-A, which became effective on January 29, 2026. The amendment opened an eighteen-month look-back window for survivors of gender-motivated violence who were harmed prior to January 9, 2022, to bring civil actions that would otherwise be time-barred.

## PARTIES

20.     Plaintiff Jane Doe 1 is a resident of Italy. At the time of the events alleged in this Complaint, Jane Doe 1 was a seventeen-year-old student attending Rudolf Steiner High School in New York City. Jane Doe 1 is a survivor of sexual assault by Jeffrey Epstein that occurred in 2004 at Defendant's Manhattan residence located at 9 East 71st Street, New York, New York.

21.     Plaintiff Jane Doe 2 is a resident of Brazil. At the time of the events alleged in this Complaint, Jane Doe 2 was a seventeen-year-old student attending Rudolf Steiner High School in New York City on scholarship. Jane Doe 2 entered the United States in 2000 on an R-2 visa. Jane Doe 2 is a survivor of sexual assault by Jeffrey Epstein that occurred in 2004 at Defendant's Manhattan residence located at 9 East 71st Street, New York, New York.

22.     Plaintiffs' true identities are known to Defendants but pseudonyms are used in this Complaint to protect their privacy.

23.     Defendant Estate of Jeffrey Edward Epstein is the estate of Jeffrey Edward Epstein, who died on August 10, 2019. The co-executors of the Estate are Darren K. Indyke and Richard D. Kahn. The Estate is being sued for the tortious conduct committed by Jeffrey Epstein, including sexual assault, forcible touching, sexual battery, sex trafficking, and other acts of gender-motivated violence against Plaintiffs.

7

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:26-cv-06142    Document 1-1    Filed 07/20/26    Page 10 of 44

24.     Defendant Leslie Herbert Wexner is, on information and belief, a resident of New Albany, Ohio, with an address at 4500 Kitzmiller Rd., New Albany, OH 43054. Defendant Wexner is the founder and former owner of a retail empire including Victoria's Secret and other entities. Between approximately 1987 and 2007, Defendant Wexner provided Jeffrey Epstein with approximately $200 million or more, which Epstein used to build and operate his sex trafficking network and to commit acts of gender-motivated violence against Plaintiffs.

25.     In July 1991, Defendant Wexner granted Jeffrey Epstein full power of attorney over his personal finances, which remained in place for approximately sixteen years until 2007. Defendant Wexner owned the property located at 9 East 71st Street, New York, New York, which he purchased in 1989 and later transferred to Epstein through Defendant Nine East 71st Street Corporation. This property served as the location where Jeffrey Epstein sexually assaulted Plaintiffs and other victims.

26.     Defendant Nine East 71st Street Corporation is a corporation with a principal place of business located at 9 East 71st Street, New York, New York 10021, and a registered address at 575 Lexington Avenue, 4th Floor, New York, New York 10022. On information and belief, Defendant Nine East 71st Street Corporation was created by Jeffrey Epstein and Defendant Leslie Herbert Wexner to hold and manage the Manhattan townhouse where all of the abuse alleged in this Complaint occurred. Jeffrey Epstein served as Chief Executive Officer of Defendant Nine East 71st Street Corporation and used the entity to facilitate his acts of gender-motivated violence against Plaintiffs.

27.     Defendant The Wexner Foundation is a charitable foundation with registered addresses at 60 East 42nd Street, Suite 1700, New York, New York 10165; 551 Madison Avenue, 9th Floor, New York, New York 10022; and 8000 Walton Parkway, Suite 100, New Albany, Ohio

8

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 1

INDEX NO. UNASSIGNED

Case 1:26-cv-06142   Document 1-1   Filed 07/20/26   Page 11 of 44

RECEIVED NYSCEF: 06/25/2026

43054. On information and belief, Defendant The Wexner Foundation is controlled by Defendant Leslie Herbert Wexner. Jeffrey Epstein served as a trustee and director of Defendant The Wexner Foundation from approximately 1992 to 2008 and was paid substantial funds by the Foundation, which he used to build and operate his sex trafficking network and to commit acts of gender-motivated violence against Plaintiffs.

### Background Regarding Jeffrey Epstein and Leslie Wexner

28.     Leslie Herbert Wexner is the founder of a retail empire that included Victoria's Secret and other prominent businesses, which made him one of the wealthiest men in America.

29.     In the 1980s, Jeffrey Epstein entered Wexner's orbit as a financial adviser and eventually gained his trust and confidence.

30.     In July 1991, Wexner granted Epstein full power of attorney over his personal finances, giving Epstein authority to transact all business, sign checks, buy and sell properties, and borrow money on Wexner's behalf. This power of attorney remained in place for approximately sixteen years, until 2007.

31.     Between 1987 and 2007, Wexner provided Epstein with approximately $200 million or more, which Epstein used to build and operate his sex trafficking network.

32.     In 1989, Wexner purchased the property at 9 East 71st Street, a 28,000-square-foot Manhattan townhouse. Wexner never resided there but later transferred control of the property to Epstein through a $10 million promissory note and personal guaranty. This property became the primary location where Epstein committed sexual assaults against Plaintiffs and other child victims.

9

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

33.    Wexner also made Epstein a trustee and director of The Wexner Foundation from approximately 1992 to 2008, and Epstein served as Chief Executive Officer of Nine East 71st Street Corporation, the entity that held the Manhattan property where Plaintiffs were assaulted.

34.    Evidence demonstrates that Wexner knew or should have known of Epstein's abuse, including a 2008 email exchange between Wexner and Epstein four days before Epstein's guilty plea, and Wexner's inclusion on an FBI list of Epstein's co-conspirators in July 2019.

### Recruitment and Sexual Assaults

35.    In 2004, Jane Doe 1 was seventeen years old and in her junior year at Rudolf Steiner High School in New York City. She was living in Queens, New York, and had already begun meeting with her college counselor to discuss her future. Like many high school juniors, she was compiling a list of schools she wanted to apply to, including a clear top choice. She had dreams of becoming an actress.

36.    Jane Doe 1 was raised in a family where money was always a source of stress, especially during her younger years in high school. While her basic needs were met and her parents found ways to make things possible for her, Jane Doe 1 wanted financial independence. She wanted the ability to buy her own things without relying on her parents.

37.    In 2004, Jane Doe 2 was seventeen years old and in her junior year at Rudolf Steiner High School in New York City. She was one of Jane Doe 1's closest friends, and they spent a significant amount of time together. Like Jane Doe 1, Jane Doe 2 was focused on her future. Toward the end of her junior year, she and her classmates began working on college applications and regularly met with a college counselor.

38.    Jane Doe 2 had entered the United States in 2000 on an R-2 visa. She was attending Rudolf Steiner High School on a scholarship. She was an immigrant living far from her home

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

country of Peru, navigating the challenges of high school in a new country and preparing for college. Money was not easy to come by.

39. One day, Jane Doe 1 went up to her neighbor's apartment ("Neighbor Doe"). They had become very close friends and spent time together almost every day. Neighbor Doe has since publicly identified herself as a survivor of Epstein.

40. Neighbor Doe told her that she had just made $250 or $300 by cleaning the home of a very wealthy man, who would later turn out to be Jeffrey Epstein. Jane Doe 1 was surprised and impressed by how much money Neighbor Doe said she had made. She told Neighbor Doe that she would love to make money like that as well and asked her how it worked, what she did, and where she went.

41. At some point during that conversation, Neighbor Doe told Jane Doe 1 that it was not actually cleaning. She said that what was required was giving the man a massage. She explained that Jane Doe 1 would go to his home, give him a massage, be in her underwear, get paid, and then leave.

42. Despite her uncertainty, Jane Doe 1 agreed. She was seventeen years old and wanted to earn money for herself.

43. After Jane Doe 1 agreed, Neighbor Doe was the person who arranged the first meeting, and multiple subsequent meetings.

44. When Jane Doe 1 asked Neighbor Doe how she had first gotten involved, Neighbor Doe told her that she had been introduced through two friends: Friend Doe 1, and Friend Doe 2, who has also subsequently identified herself as a survivor of Jeffrey Epstein. Neighbor Doe told Jane Doe 1 that it was through Friend Doe 1 and Friend Doe 2 that she herself was introduced to Jeffrey Epstein.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1   Case 1:26-cv-06142   Document 1-1   Filed 07/20/26   Page 14 of 44   RECEIVED NYSCEF: 06/25/2026

45.     Jane Doe 1 knew both Friend Doe 1 and Friend Doe 2 personally. They spent time together frequently, went out together, and socialized often.

46.     During this time, Neighbor Doe gave Jane Doe 1 the phone number of a woman named "Leslie," who Jane Doe 1 understood to be one of Jeffrey Epstein's secretaries. The process was that girls would call "Leslie," give their name, and say that they wanted to see Jeffrey, and she would later call back with a date and time.

47.     Jane Doe 1 still has the piece of paper with the phone number written on it, next to the name "Leslie." There is no additional context written on the paper, only the name and the number: 212-750-9895. Jane Doe 1 kept this paper in her homework binder from high school.

48.     This same phone number, 212-750-9895, appears throughout the publicly released Epstein files, including, but not limited to:

- It appears on a Zorro Trust legal document listing "Jeffrey E. Epstein" with telephone 212-750-9895.

- Cingular/AT&T subscriber records for Epstein's cell phone account list 212-750-9895 as the contact phone for Sarah Kellen at 457 Madison Ave, New York.

- Phone records show calls to and from 212-750-9895 on Epstein's cell account.

49.     The first time Jane Doe 1 went to Epstein's home, Neighbor Doe arranged the visit and she went with Neighbor Doe. She remembers arriving at the house and being struck by how large it was. It felt like a mansion, with a very large, imposing front door. When they rang the doorbell, a woman who appeared to be a maid, wearing what Jane Doe 1 remembers as a maid's uniform, answered the door. Everything felt very formal and polished, the way extreme wealth is often portrayed in movies.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1    Case 1:26-cv-06142    Document 1-1    Filed 07/20/26    Page 15 of 44    RECEIVED NYSCEF: 06/25/2026

50.     They were escorted inside and brought to what Jane Doe 1 recalls as a kitchen or kitchenette area. Jane Doe 1 remembers the space opening into a very large area. Neighbor Doe and Jane Doe 1 waited there together.

51.     After some time, Jane Doe 1 was called and escorted alone by a staff member upstairs. She remembers taking an elevator. When the elevator doors opened, she recalls seeing a large painting of a young girl. She remembers thinking to herself that it might be his daughter, not realizing at the time that it was likely something far more sinister.

52.     Jane Doe 1 was then led by the staff member into what appeared to be a massage room. The lighting was very low, and the room felt dark and enclosed. There was a massage table in the center of the room. Near the headrest of the table, there was a small surface or table with a telephone, and Jane Doe 1 remembers that Epstein would sometimes be on phone calls during massages.

53.     Jane Doe 1 also remembers a bathroom connected to or adjacent to the room, including a large shower, though she cannot recall the exact layout. After being escorted into the room, she was left there alone.

54.     When Jane Doe 1 was escorted upstairs by a staff member, when a maid opened the door and made the visit feel routine and normal, when the massage table was already prepared with baby oil and towels, none of that happened by accident. The household staff who facilitated Epstein's assaults were employed through Defendant Nine East 71st Street Corporation or through funds provided by Defendant Wexner. The operational machinery that made Jane Doe 1 and Jane Doe 2's assaults possible, the staff, the scheduling system, the supplies, was funded and maintained through Wexner's money. Between 1987 and 2007, Wexner provided Epstein with approximately

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1    Case 1:26-cv-06142    Document 1-1    Filed 07/20/26    Page 16 of 44    RECEIVED NYSCEF: 06/25/2026

$200 million or more. It was Wexner's dollars that paid the maid who opened the door. It was Wexner's property that held the room.

55.    Jane Doe 1 did not know what she was walking into. She was seventeen years old, alone in a dim, enclosed room in a stranger's mansion, having been separated from Neighbor Doe without explanation. She was left there alone. The isolation was immediate and disorienting. She was unsure of where Neighbor Doe was waiting or why they had been separated. The low lighting, the unfamiliar space, the silence — all of it created a sense of vulnerability that Epstein would shortly exploit.

56.    Jane Doe 1 had been told, possibly by Neighbor Doe in advance, to undress down to her underwear. After a short period of time, Jeffrey Epstein came in wearing a robe.

57.    What stood out to Jane Doe 1 was his demeanor. He appeared calm and composed, almost reassuring. He spoke in a way that felt intended to put her at ease, saying things that conveyed "don't be scared" or "don't be afraid." He asked her ordinary, conversational questions, such as what she liked, what her interests or passions were, and other general questions about her life in an effort to lower her guard. He took off his robe and got onto the massage table.

58.    Epstein then began explaining to her what she was expected to do. There was oil there that she used to massage him. Epstein laid face up and had her stand on the side of him and massage his chest. She was topless and had underwear on, but Epstein demanded that she take her underwear off.

59.    As Jane Doe 1 continued to massage his chest, Epstein began to touch her intimate area and penetrated his fingers inside of her underwear and into her vagina.

60.    At that moment, Jane Doe 1 got very scared and ran to the bathroom and locked herself inside and started crying. She was not overreacting. She was a seventeen-year-old who had

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

just been digitally penetrated without warning or consent by a man she had never met before. Epstein, audibly enraged, yelled "WHAT THE FUCK!" and demanded that she come out. For Jane Doe 1, trapped in a bathroom in a stranger's mansion, the sound of this powerful man's rage confirmed what her body already knew: she was not safe. She was terrified of what this older man intended to do to her.

61.     Neighbor Doe started calling out to Jane Doe 1, attempting to calm her down and convince her to come out. Jane Doe 1 heard the urgency in her friend's voice, a seriousness she had never heard before. It was clear to Jane Doe 1 that Neighbor Doe was afraid that she would get in trouble as well if Jane Doe 1 did not finish the massage. Jane Doe 1 was not only frightened for herself; she was frightened for her friend. She came out. She was a child, alone in that mansion, surrounded by adults who expected her to comply, and she did.

62.     Jane Doe 1 came out and followed Neighbor Doe back to the table where Epstein was. Neighbor Doe began massaging him in his midsection and Jane Doe 1 followed her lead by massaging his legs.   Throughout the encounter, Epstein behaved with a disturbing casualness, asking the girls questions about their lives and interests as though the situation were ordinary, a calculated affectation of normalcy that Jane Doe 1 recalls as deeply disorienting. Epstein massaged and masturbated himself and touched Neighbor Doe while watching them massage him.

63.     After Epstein had finished masturbating, Neighbor Doe and Jane Doe 1 got dressed.

64.     Jane Doe 1 felt an overall and persistent feeling of dread and confusion. She remembers thinking, in a general sense, "What just happened? How is this possible? What is going on?" She felt shocked, disgusted, and deeply disturbed by the situation.

65.     Jane Doe 1 remembers being struck by the contradiction of it all. Here was an incredibly wealthy and powerful man who presented himself as calm, reassuring, and almost

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

protective, while at the same time she knew that what was happening was wrong. She was a child. At the time, she did not have the ability or emotional maturity to process this, but she felt psychologically unsettled and confused.

66. At some point afterward, Neighbor Doe gave Jane Doe 1 her money for the massage and told Jane Doe 1 that Epstein wanted to see her again. Jane Doe 1 remembers feeling very nervous about this. Internally, she had already decided that she never wanted to be alone with him again because she feared that she might be raped. She told Neighbor Doe that she would only go back if she was not alone, if Neighbor Doe or another girl came with her. She said that if there were two of them, she would go. Jane Doe 1 believed that she could not be raped if she were not alone.

67. After that, the subsequent visits Jane Doe 1 attended were always with another girl. Sometimes it was Jane Doe 1 and Neighbor Doe, and at least once it was Jane Doe 1 and another girl. Jane Doe 1 believes that she went to Epstein's home on 71st Street five or six times. Each time, Jane Doe 1 made more money than she had ever made in her life. The other girls talked about it like a part time after school job. Each time she went she got increasingly more disturbed about what was happening to her, even though Epstein continued to chat with them as if they were distant family friends he was making small talk with. He acted as if he was interested in their lives and their futures-and like he wanted to help them.

68. On most subsequent visits, Jane Doe 1 was accompanied by Neighbor Doe. During these encounters, Neighbor Doe took an active and dominant role, directing Jane Doe 1 on how to conduct herself — telling her to "play with the situation" — and speaking in a sexually explicit manner toward Epstein. Jane Doe 1 was shocked by how grown up Neighbor Doe acted at Epstein's house and she wondered if she was not sexual or adult enough as teenagers do. Jane

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Doe 1, by contrast, remained quiet and compliant. While Jane Doe 1 massaged Epstein, he touched her body, including her intimate areas, most frequently her breasts. Neighbor Doe engaged in more overtly sexual conduct, including massaging Epstein's inner thighs.

69.     Each time she went she got increasingly more disturbed about what was happening to her, even as the other girls spoke about the encounters casually, as though they were an after-school job. Jane Doe 1 could not share that detachment. She felt shocked and disturbed by the situation. She remembered being struck by the contradiction of it all, here was an incredibly wealthy and powerful man who presented himself as calm, reassuring, and almost protective, while at the same time she knew that what was happening was deeply wrong. At the time, she did not have the ability or emotional maturity to process this, but she remembered feeling psychologically unsettled and confused. She kept returning. Not because she had made peace with what was happening to her, but because she had found no way out that felt safe.

70.     On multiple occasions during these encounters, Epstein received phone calls and took them mid-session, conducting what appeared to be a work-related conversation while these teenage girls continued to massage him. His willingness to take a business call in the middle of a sexual encounter, without pausing or acknowledging what was occurring, reflected the extent to which he had normalized the sexual exploitation of the young women in that room, treating it as a routine backdrop to his daily affairs. Jane Doe 1 recalls this as one of the most chilling aspects of her experiences: that to Epstein, what was happening to her-and to Neighbor Doe and to whatever young women he brought there was unremarkable.

71.     Jane Doe 1 believes that she personally called Leslie at least once, to arrange a visit when she went with another girl. Jane Doe 1 remembers clearly that Neighbor Doe, Friend Doe 1, and Friend Doe 2 appeared to have a much closer and more established relationship with Jeffrey

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 1

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 06/25/2026

Case 1:26-cv-06142    Document 1-1    Filed 07/20/26    Page 20 of 44

Epstein. They would call him, or his staff, for various favors or needs. Jane Doe 1 remembers hearing about and witnessing requests for help with everyday matters. For example, she remembers an instance when Neighbor Doe had severe tooth pain and called Leslie to ask for help scheduling a dentist appointment, and she was sent to Jeffrey's dentist and Jeffrey covered the costs.

72. Jane Doe 1 did not have that kind of relationship or access, but they did. She remembers listening to and observing these interactions and favors being requested and granted. It was obvious that she was being told about these favors as an incentive to explain what could be available to her if she continued to acquiesce to Epstein.

73. Around the same time that Jane Doe 1 had her first encounter with Epstein, Jane Doe 1 confided in her friend Jane Doe 2 that Neighbor Doe had found her a job making a huge amount of money. When Jane Doe 2 asked how , Jane Doe 1 explained that the job was massaging a man.

74. Jane Doe 2 previously met Neighbor Doe on several occasions. They spent time together at Jane Doe 1's house and once socialized with Neighbor Doe and her friends, Friend Doe 1 and Friend Doe 2. Based on her relationship with Jane Doe 1 and her familiarity with Neighbor Doe, Jane Doe 2 became interested in earning huge sums of money from massaging a man.

75. After school that day, Jane Doe 2 went home and got ready. She took the 6 train uptown and got off at 68th Street. She texted Jane Doe 1 to let her know she was walking to the address but she had gotten lost.

76. When Jane Doe 2 arrived at 9 East 71st Street, she rang the bell, and shortly afterward a maid opened the door. The door was very large and made of wood. Jane Doe 2 entered the house and walked down a hallway. The maid then showed her to a room and told her to wait there.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1

Case 1:26-cv-06142    Document 1-1    Filed 07/20/26    Page 21 of 44

RECEIVED NYSCEF: 06/25/2026

77. There is not much that Jane Doe 2 remembers of that first encounter massaging Epstein, which has been buried deep down for the last twenty-two years. But Jane Doe 2 does remember that, at some point following her first encounter with Epstein, Neighbor Doe told Jane Doe 2, "He really liked your bush." Jane Doe 2 felt very embarrassed by that comment.

### Epstein Sexually Assaults Jane Doe 1 and Jane Doe 2 Together

78. The next time Jane Doe 2 went to Epstein's home on 71st Street, Jane Doe 1 and Neighbor Doe were already in the room when Jane Doe 2 arrived. Jane Doe 2 felt nervous, and they reassured her that it would be quick. Neighbor Doe explained that they were supposed to massage a man, who Jane Doe 2 later learned was Epstein, using baby oil.

79. The room had bookshelves reaching the ceiling, and in the center there was a massage table covered in brown leather. There were bottles of baby oil and paper towels prepared in the room. Everything was set up in advance, as if this was a routine that had been repeated many times before.

80. They then went to a large, round bathhouse-style room with showers along the walls. There were white towels placed in the center of the room. After showering, Jane Doe 2 wrapped herself in a towel, and they all returned to the massage room without putting their clothes back on, remaining completely nude. Jane Doe 2 had not expected this, but she followed what the other girls were doing.

81. A few minutes later, Epstein entered the room. He smiled, greeted them enthusiastically, and wearing a robe, sat on the massage table before removing it.

82. The three girls approached him, applied baby oil to their hands, and began touching him. Neighbor Doe led most of the conversation while also instructing Jane Doe 1 and Jane Doe 2 to massage his penis, inner thighs, chest, and back.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

83. During this time, Epstein also grabbed at, forcibly touched, and fondled Jane Doe 1 and Jane Doe 2's genitals and breasts. Jane Doe 1 and Jane Doe 2 did not consent to any sexual contact with Epstein, and lacked any meaningful ability to do so given their age and the power dynamic. They agreed to give a massage, not to be sexually assaulted. Both women were frightened of what would happen if they said no, disgusted by the fact that they had to engage in sexual conduct with this older man, and ashamed that they ended up in that position.

84. The girls were made to rotate positions so that each of them was directly in front of Epstein while touching him. Jane Doe 2 remembers Epstein getting off of the table and standing directly in front of her at one point. His face was slightly above hers, and his chest hair was so close to her face that the moment remains vivid in her memory.

85. Jane Doe 2 felt trapped in that position, forced to touch his genitals, which she had never agreed to do, while a powerful man, who claimed he could help young girls with their careers, used them for his own gratification. She stood in front of him, his face slightly above hers, his chest hair so close to her face that the moment remains vivid in her memory. That image of being pressed into proximity with a man who was violating her has never left her. She was so overwhelmed by what was happening to her that she left her watch behind.

86. Jane Doe 2 does not remember how she got home that day. Her next clear memory is of seeing Jane Doe 1 at school the following day, when Jane Doe 1 gave her the money. She bought an iPod. To a seventeen-year-old, buying an iPod felt like a significant purchase, something she wanted but could not otherwise afford. But whatever fleeting value that money had was overwhelmed by the terrible cost at which it came: her dignity, her innocence, her sense of safety, and the beginning of trauma that would stay with her forever. She never returned.

20

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 1

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 06/25/2026

87.     The mansion where all of this happened, where Jane Doe 1 ran to a bathroom and cried while a man raged outside the door, where Jane Doe 2 forgot her watch because she was too overwhelmed to think, was not Jeffrey Epstein's property. The property belonged to Defendant Leslie Herbert Wexner, who purchased it in 1989 and later transferred it to Epstein for a fraction of its value. Wexner never lived there. The assault of Jane Doe 1 and Jane Doe 2 could not have occurred without a location. Wexner provided that location. Without him, there was no mansion. Without the mansion, there was no massage room. Without the massage room, there was no assault.

88.     The last time Jane Doe 1 went to Jeffrey Epstein's home, she was there with Neighbor Doe. It was just the two of them. She remembers that, as on other occasions, there was casual conversation. This time, they spoke about college, including the schools Jane Doe 1 was interested in and planning to visit.

89.     At one point, Jeffrey asked Jane Doe 1 what her top college choice was. She told him that it was Syracuse University. He responded very matter-of-factly and said: "If you fuck me right now I'll make a phone call that makes sure you get accepted early decision when you apply."

90.     Jane Doe 1 was horrified and said no.  Epstein then tried to verbally persuade her otherwise, telling her that it would be an easy guarantee, that she would be "set," and that it would only take one phone call. He framed it as an opportunity she would be foolish to pass up. Jane Doe 1, horrified, again said no.

91.     In that moment, Jane Doe 1 became scared and intimidated by the extent of power Epstein wielded.

92.     That moment was a defining turning point for Jane Doe 1. She knew with certainty that she would never return. She remembers feeling frightened, especially realizing that if she had

21

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

been alone, she did not know what could have happened after she refused. She understood that this was the direction he was trying to push things, and it was not something she was willing to allow or participate in.

93.    In that moment, Jane Doe 1 knew that continuing would cause her significant psychological harm and regret. She recognized that what had already occurred was something she struggled to reconcile, and she was not willing to cross another boundary. That was the last time she saw Jeffrey Epstein.

94.    The fact that multiple girls were present during these assaults demonstrates the organized nature of Epstein's operation. This was not a spontaneous act. It was a carefully orchestrated system in which recruiters brought multiple girls at once, creating an environment where the girls felt pressured to participate because others were participating, and where Epstein could exploit multiple victims simultaneously.

95.    Jane Doe 1 and Jane Doe 2 were assaulted in 2004. By that point, Wexner had already been told, by his own Victoria's Secret executives in the mid-1990s, that Epstein was misusing his name to recruit young women. Despite being informed by his own employees at Victoria's Secret that Epstein was misusing Wexner's name and the Victoria's Secret brand to recruit and abuse women, Defendant Wexner took no action to stop Epstein or to terminate their relationship. Jane Doe 1 and Jane Doe 2 were assaulted years after Wexner had been given this warning. Had he acted on it, they might never have walked through that door.

96.    Epstein continued his operation for years after Jane Doe 1 and Jane Doe 2 were assaulted and Wexner continued to fund him. In 2008, four days before Jeffrey Epstein pleaded guilty to solicitation charges including solicitation of a minor, Defendant Wexner sent Epstein an email stating: "Abigail told me the result ... all I can say is I feel sorry. You violated your own

22

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

number 1 rule ... always be careful." He did not express outrage. He did not express grief for the girls Epstein had assaulted. He expressed concern that Epstein had been caught. That email was written years after Jane Doe 1 and Jane Doe 2 had already been victimized in the mansion Wexner provided with the money Wexner gave.

### Epstein's Abuse of Jane Doe 1 and Jane Doe 2 as Children Causes them to Suffer Significant Psychological Effects

97.     After Jane Doe 1 walked away from her involvement with Jeffrey Epstein, she buried the experience very deeply. At the time, she believes she was in shock and likely traumatized. What happened was overwhelming and disturbing, and it was not something she had the capacity to process as a seventeen-year-old. She did not speak about it, reflect on it, or allow herself to think about it. Instead, she blocked it out as if it had never happened.

98.     Around 2019, Jane Doe 1 saw Epstein's face on the news. Seeing him unexpectedly caused an immediate physical reaction. She felt as though the wind had been knocked out of her. She recognized him instantly and remembers thinking, "that's Jeffrey." As she learned more from the news coverage, she began to understand the scale of his operation and realized that what she experienced was not isolated. Jane Doe 1's experience was not an isolated incident. It was part of a systematic operation in which young girls were recruited through peer networks, brought to Epstein's Manhattan residence at 9 East 71st Street, prepared through a specific routine involving showers and massage tables, and then sexually assaulted by Epstein while staff and recruiters facilitated the abuse. The same location, the same methodology, the same infrastructure, and the same enablers made it possible for Epstein to assault both Jane Doe 1 and Jane Doe 2.

99.     Like Jane Doe 1, Jane Doe 2 was a minor when Jeffrey Epstein sexually assaulted her. She was just seventeen years old, an immigrant living far from her family in Peru, and a

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

scholarship student working to build a future for herself. She was vulnerable, and Epstein preyed on that vulnerability for his own sexual gratification.

100. The assault has had lasting effects on Jane Doe 2. She has endured nervousness, shame, and trauma as a result of what was done to her. For years, she had been haunted by the memory of standing in front of Epstein, his face close to hers, his hands on her body without her consent. She has also carried the humiliation of Neighbor Doe's crude comment, the memory of being paid for sexual acts she never agreed to, and the disturbing realization that Epstein was using promises of college admissions and future opportunities to coerce underage girls into sex acts. Together, those memories have caused profound and enduring psychological harm.

101. Like Jane Doe 1, Jane Doe 2 buried these memories for many years. She did not speak about what happened to her. She tried to move forward with her life. But trauma does not simply disappear. It remained with her, and when the news of Jeffrey Epstein's crimes became public, she was forced to confront the abuse inflicted on her when she was only seventeen years old.

### Defendants' Enabling Conduct and Knowledge

102. Defendants Leslie Herbert Wexner, Nine East 71st Street Corporation, and The Wexner Foundation did not merely provide incidental support to Jeffrey Epstein. They created, funded, and maintained the infrastructure that made his sex trafficking operation possible. Without the property, money, staff, and institutional legitimacy that Defendants provided to Epstein, the sexual assaults of Jane Doe 1 and Jane Doe 2 would never have occurred.

103. Every sexual assault committed by Jeffrey Epstein against Jane Doe 1 and Jane Doe 2 occurred at 9 East 71st Street, New York, New York. This property was owned by Defendant Leslie Herbert Wexner, who purchased it in 1989. Wexner never resided at the property himself.

24

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 1    INDEX NO. UNASSIGNED

Case 1:26-cv-06142    Document 1-1    Filed 07/20/26    Page 27 of 44

RECEIVED NYSCEF: 06/25/2026

Instead, he provided it to Jeffrey Epstein, who used it as the primary location for sexually assaulting young women and girls.

104.    Defendant Wexner transferred control of 9 East 71st Street to Epstein through a structured transaction involving Defendant Nine East 71st Street Corporation, a $10 million promissory note, and a personal guaranty signed by Epstein. According to a Wexner spokesperson, "Wexner never resided at the residence." The property was acquired and maintained for Epstein's use.

105.    The Manhattan townhouse at 9 East 71st Street was not simply a location where Epstein happened to commit crimes. It was a facility specifically designed and maintained to facilitate sexual abuse. The property contained:

    a.    Household staff, including a maid who opened the door and greeted victims when they arrived, creating an appearance of legitimacy and normalcy;

    b.    Staff members who escorted victims through the residence, including via elevator to the massage rooms on upper floors;

    c.    Multiple massage rooms equipped with massage tables, low lighting, telephones, and adjacent bathrooms with large showers;

    d.    Supplies used in the assaults, including baby oil, paper towels, white towels, and other materials that were prepared and ready for use in each encounter;

    e.    A bathhouse-style shower room where victims were directed to shower before being brought to the massage room;

    f.    Elevator access that provided a sense of grandeur and control, reinforcing Epstein's appearance of wealth and power; and

    g.    A waiting area where victims were held before being called for their appointments.

25

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

106.    The infrastructure at 9 East 71st Street was maintained and staffed at Defendant Wexner's expense. The household staff who facilitated Epstein's assaults were employed through Defendant Nine East 71st Street Corporation or through funds provided by Defendant Wexner. Without this staffing and infrastructure, Epstein would not have been able to operate a systematic trafficking operation.

107.    The appointments at which Jane Doe 1 and Jane Doe 2 were sexually assaulted were scheduled through a secretary or assistant named "Leslie," who operated out of Epstein's office and who was reachable at the phone number 212-750-9895. Victims, including Jane Doe 1, would call this number, provide their name, say they wanted to see Epstein, and receive a callback with a scheduled date and time.

108.    The scheduling system operated by "Leslie" was not a private arrangement between Epstein and a personal assistant. It was part of the organizational structure provided to Epstein through Defendant Wexner's business operations. Epstein's office was located at 457 Madison Avenue, New York, New York 10022, an address listed on the power of attorney Defendant Wexner granted to Epstein in July 1991.

109.    "Leslie" and the scheduling system she operated were part of the enabling infrastructure that Defendants provided to Epstein. This system allowed Epstein to manage appointments with multiple victims, to maintain records of who was coming and when, and to operate his trafficking operation with efficiency and organization. Jane Doe 1 personally witnessed "Leslie" being used to arrange favors for recruiters, including dental appointments paid for by Epstein.

110.    It is reported that a woman named Lesley Groff was employed by Epstein as an Executive Assistant from 2001 until Epstein died in a New York prison cell in 2019 while facing

26

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 1    Case 1:26-cv-06142    Document 1-1    Filed 07/20/26    Page 29 of 44

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 06/25/2026

charges of trafficking hundreds of women and girls for sex. Lesley Groff was reportedly tasked with keeping a tight handle on his schedule, meetings and travel. Groff's name is mentioned 157,613 times in the Epstein files, more than anyone else besides Epstein.

111.    The money Defendant Wexner provided to Jeffrey Epstein was the financial foundation of Epstein's sex trafficking operation. Between approximately 1987 and 2007, Defendant Wexner provided Epstein with approximately $200 million or more. This money was used by Epstein to:

a.    Pay cash to victims, including Jane Doe 1 and Jane Doe 2, for their participation in sexual acts;

b.    Pay recruiters who brought victims to Epstein's residence;

c.    Maintain and staff the property at 9 East 71st Street;

d.    Provide favors and benefits to victims and recruiters to maintain their loyalty and silence, including medical and dental care, transportation, and other services;

e.    Purchase supplies used in the assaults;

f.    Create the appearance of wealth and power that disarmed victims and made them believe Epstein could help them with their careers and futures; and

g.    Operate a private jet, maintain additional properties, and fund a lifestyle that allowed Epstein to present himself as a legitimate businessman and philanthropist.

112.    According to Forbes, between 1999 and 2018, Epstein's two main businesses received over $800 million in revenue, consisting of $490 million in fees and $310 million from investment returns. Of the $490 million in fee income, approximately 75% came from Epstein's two largest clients, including Defendant Wexner.

113.    At Defendant Wexner's congressional deposition on February 18, 2026, Representative Robert Garcia pointed to approximately a billion dollars in value that moved from

27

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 1    Case 1:26-cv-06142    Document 1-1    Filed 07/20/26    Page 30 of 44    INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 06/25/2026

Wexner to Epstein, transferred, provided in stocks, or given directly. Garcia stated that Wexner claimed he was unaware of how much money moved between them and was trying to minimize their closeness over roughly two decades.

114. Defendant Wexner knew or should have known that Jeffrey Epstein was using the resources, property, and money Wexner provided to sexually abuse women and girls. The evidence of Wexner's knowledge includes the following:

115. In May 1996, Maria Farmer traveled to Defendant Wexner's property in New Albany, Ohio. Farmer stated in an affidavit that Epstein and Ghislaine Maxwell came to the property and sexually assaulted her. She escaped into another part of the house and barricaded herself inside. Farmer's lawsuit claims Wexner's security team did not allow her to leave after the alleged assault. A security guard told her: "You're not going anywhere. You are never leaving." She was held against her will for twelve hours and was eventually able to depart when her father arrived after driving from Kentucky.

116. An officer involved with Wexner security at the time told the Washington Post on condition of anonymity that the house was guarded by Wexner's security staff and "anybody that was going to be coming on property had to be announced and allowed in by the Wexners. Nobody had carte blanche to go in and off the property."

117. Despite the fact that an assault occurred on his own property, under the watch of his own security personnel, Defendant Wexner took no action to terminate his relationship with Epstein, to investigate Epstein's conduct, or to prevent future abuse. If he had, Plaintiffs may have never been sexually assaulted.

118. In 1997, model Alicia Arden filed a police report alleging that Epstein had groped her in a California hotel room after a friend told her Epstein was a talent scout for Victoria's Secret

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

(owned by Defendant Wexner) who could get her into the catalogue. Arden alleged that Epstein began groping her after asking her to strip down to her underwear. She ran out of the room crying and filed a police report.

119.    Multiple former executives and models have stated that as early as 1993, Epstein was portraying himself as a Victoria's Secret talent scout. Company executives learned of this and told Defendant Wexner in the mid-1990s. According to reporting, Wexner was alerted by executives and reportedly said he would handle the issue, but Epstein's involvement in trying to attract models continued.

120.    Despite being informed by his own employees at Victoria's Secret that Epstein was misusing Wexner's name and the Victoria's Secret brand to recruit and abuse women, Defendant Wexner took no action to stop Epstein or to terminate their relationship. Instead, Wexner continued to provide Epstein with money, property, power of attorney, and access to his businesses.

121.    In January 2003, Defendant Wexner signed Epstein's 50th birthday book. His message read: "Dear Jeffrey, I wanted to get you what you want...so here it is..." with a drawing of a pair of breasts underneath, signed "Happy Birthday, your friend, Leslie."

122.    While Wexner's spokesperson called this a misguided attempt at humor, the birthday book entry demonstrates an awareness of Epstein's sexual character and a willingness to joke about Epstein's exploitation of women. The entry was made in January 2003, years after the Maria Farmer assault, years after the Alicia Arden police report, and years after Wexner had been informed by his own executives that Epstein was misusing the Victoria's Secret name to recruit women.

123.    In 2008, four days before Jeffrey Epstein pleaded guilty to solicitation charges including solicitation of a minor, Defendant Wexner sent Epstein an email stating: "Abigail told

29

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 1    Case 1:26-cv-06142    Document 1-1    Filed 07/20/26    Page 32 of 44    INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 06/25/2026

me the result...all I can say is I feel sorry. You violated your own number 1 rule...always be careful." Epstein replied with "no excuse."

124.    This email exchange occurred in 2008, months after Defendant Wexner claims to have ended his relationship with Epstein in 2007. The email demonstrates that Wexner maintained contact with Epstein even after Epstein's criminal conduct had been exposed. More significantly, the language of the email suggests that Wexner's concern was not with Epstein's abuse of victims, but with Epstein getting caught. Wexner expressed that he felt "sorry" for Epstein and characterized Epstein's crime as violating the rule to "always be careful," rather than expressing horror or outrage at Epstein's sexual exploitation of a minor.

125.    In an unsent draft letter released by the Department of Justice, Epstein wrote to Defendant Wexner: "You and I had 'gang stuff' for over 15 years" and referred to secrets the two of them kept from Wexner's wife. Epstein also wrote: "I never ever, did anything without informing les [Leslie Wexner]"; "would never put les [Leslie Wexner] in harms way"; and "would never give him up."

126.    In another email addressed to Defendant Wexner, Epstein wrote: "I have never once, not once, done anything, but protect your interests"; "I always told you I would never under any circumstances give it up, or put you in harms way, no matter who, what or when."

127.    These communications demonstrate a deeply intimate and conspiratorial relationship between Epstein and Defendant Wexner, in which the two men shared secrets, protected each other, and engaged in conduct together that they concealed from Wexner's wife and the public.

128.    Virginia Roberts Giuffre, an Epstein victim, bravely gave sworn testimony on January 16, 2016, in which she alleged that she was trafficked to Defendant Leslie Wexner and

30

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

had sex with him on multiple occasions. When asked "How many times did you have sex with Les Wexner?", Giuffre answered: "Multiple." When asked if it was "More than three?", she answered: "More than three." She also testified that she, along with Sarah Kellen, had sex with Wexner in New Mexico.

129. Although Defendant Wexner has denied these allegations, Giuffre's sworn testimony provides additional evidence that Wexner was not merely an enabler who turned a blind eye to Epstein's conduct, but was himself a participant in the sex trafficking operation that Epstein ran using Wexner's resources.

130. In July 2019, Defendant Wexner was included on a list of Epstein's "10 co-conspirators" within an FBI email, alongside Ghislaine Maxwell, Jean-Luc Brunel, and Leslie Groff. The same document noted there was "limited evidence" of his involvement. Wexner was subpoenaed by authorities in 2019.

131. Weeks after Epstein's death, JPMorgan Chase filed suspicious activity reports for transactions conducted by Defendant Wexner, as well as Glenn Dubin, Leon Black, and Alan Dershowitz, totaling about $1 billion. Reporting based on JPMorgan disclosures identified roughly 4,700 potentially suspicious transactions tied to Epstein, and singled out approximately $65 million in mid-2000s wire transfers connected with Wexner's trusts.

132. At his congressional deposition on February 18, 2026, Defendant Wexner formally admitted: "I formally hired Jeffrey Epstein to manage my personal finances"; "I provided Epstein with a power of attorney so he could execute transactions quickly"; and, "I provided the same scope of authority to Epstein as I did to his successor." Wexner also admitted that he visited Epstein's island and ranch, and that he sold Epstein the property at 9 East 71st Street.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

133. After Defendant Wexner's deposition, Ranking Member of the Committee on Oversight and Government Reform Congressman Robert Garcia remarked: "We should be very clear that there would be no Epstein island, there would be no Epstein plane, there would be no money to traffic women and girls, Mr. Epstein would not be the wealthy man he was without the support of Les Wexner."

134. Representative Dave Min stated after the deposition that he did not find Wexner's account believable: "He has basically alleged that he 'saw no evil, heard no evil,' despite being in the room with Jeffrey Epstein over and over and over. And it's really just not credible."

135. Defendant Nine East 71st Street Corporation enabled Epstein's acts of gender-motivated violence against Jane Doe 1 and Jane Doe 2 by furnishing Epstein with the property where the assaults occurred, by maintaining household staff who facilitated access to victims, and by providing a location where Epstein could operate his trafficking enterprise with the appearance of legitimacy.

136. Defendant The Wexner Foundation enabled Epstein's acts of gender-motivated violence against Jane Doe 1 and Jane Doe 2 by employing Epstein as a trustee and director, by paying him substantial funds that he used to operate his trafficking network, and by providing him with institutional legitimacy that allowed him to present himself as a respected businessman and philanthropist rather than a sexual predator.

137. At all relevant times, Defendants Leslie Herbert Wexner, Nine East 71st Street Corporation, and The Wexner Foundation knew or should have known that Jeffrey Epstein was using the resources, property, and institutional support they provided to sexually abuse women and minor girls, including Jane Doe 1 and Jane Doe 2.

32

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

138. Despite multiple warnings, complaints, police reports, lawsuits, and direct evidence of Epstein's pattern of abuse, Defendants made a conscious choice to continue empowering Epstein with money, property, staff, and institutional legitimacy. This was not passive enabling. This was active participation in creating and maintaining the conditions that allowed Epstein to operate a sex trafficking network and to sexually assault Jane Doe 1 and Jane Doe 2.

### Timeliness Under the GMVA Look-Back Window

139. This action is timely filed pursuant to the New York City Gender-Motivated Violence Protection Act (NYC Admin. Code § 10-1101 et seq.), as amended by Introduction 1297-A, which was enacted on January 29, 2026. Introduction 1297-A amended the GMVA to create a look-back provision that allows survivors of gender-motivated violence who were harmed prior to January 9, 2022, to file suit within eighteen months of the amendment's enactment. This Complaint is filed on June 25, 2026, well within the eighteen-month window that opened on January 29, 2026.

140. The GMVA look-back window has already been successfully invoked in similar litigation against these same Defendants. On March 4, 2026, ten plaintiffs filed a verified complaint in New York Supreme Court against Leslie Herbert Wexner, Nine East 71st Street Corporation, and The Wexner Foundation, alleging enabling and conspiracy for gender-motivated violence under the same statutory framework. The filing of that lawsuit demonstrates that the legislature specifically intended to allow survivors like Plaintiffs to seek justice for acts of gender-motivated violence that occurred decades ago.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## CLAIMS

### FIRST CAUSE OF ACTION
### Violation of GMVA: Gender-Motivated Violence
### (NYC Admin. Code § 10-1101 *et seq.*)
### *As Against Defendant Estate of Jeffrey Epstein*

141. Plaintiffs repeat, reiterate and reallege each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein, inclusive, with the same force and effect as if hereinafter set forth at length.

142. Plaintiffs Jane Doe 1 and Jane Doe 2 are victims of gender-motivated violence as defined under New York City Administrative Code § 10-1101 *et seq.* (the "GMVA"). Jeffrey Epstein's sexual assaults of both Plaintiffs, which included digital penetration, forced sexual contact, non-consensual touching of intimate body parts, and sexual exploitation motivated by gender, constitute crimes of violence motivated by gender within the meaning of the GMVA.

143. In violation of the GMVA, Jeffrey Epstein engaged in acts of gender-motivated violence against Plaintiffs by creating and maintaining the sex trafficking enterprise at 9 East 71st Street, New York, New York. Epstein's conduct included, but was not limited to: maintaining the property at 9 East 71st Street as a facility specifically designed and equipped for sexually assaulting women and minor girls; employing and directing household staff to facilitate victim access and create an appearance of legitimacy; operating a scheduling system through his assistant "Leslie" to arrange appointments with victims; paying victims cash to maintain their silence and participation; recruiting young women and girls through peer networks; providing favors and benefits to recruiters and victims to maintain loyalty and control; and using his wealth and power to coerce victims through quid pro quo offers such as college admissions in exchange for sex.

144. Therefore, as a result of the conduct complained of herein, Jeffrey Epstein has violated the GMVA and as such, the Estate is liable to Plaintiffs for: (1) compensatory and punitive

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

34

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 1    Case 1:26-cv-06142    Document 1-1    Filed 07/20/26    Page 37 of 44    INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 06/25/2026

damages; (2) injunctive and declaratory relief; (3) attorneys' fees and costs; and (4) such other relief as a court may deem appropriate.

145. As a direct and proximate result of the Estate of Jeffrey Epstein's violations of the GMVA, Plaintiffs have sustained in the past, and will continue to sustain in the future, physical injury, pain and suffering, serious and severe psychological and emotional distress, mental anguish, embarrassment and humiliation.

146. As a direct and proximate result of the Estate of Jeffrey Epstein's violations of the GMVA, Plaintiffs have incurred medical expenses and other economic damages, and continue to be in physical pain and suffering, and will now be obligated to expend sums of money for medical care and attention in an effort to cure themselves of their injuries and to alleviate their pain and suffering, emotional distress, mental anguish, embarrassment and humiliation.

147. By reason of the foregoing, Plaintiffs were caused to sustain severe and serious personal injuries, a severe shock to their nervous system and certain internal injuries, and were caused to suffer severe physical pain and mental anguish as a result thereof, and upon information and belief these injuries are of a permanent and lasting nature; that said Plaintiffs were incapacitated from attending their regular activities; and there was caused to be expended sums of money for medical care on their behalf.

148. By reason of the foregoing, Plaintiffs are entitled to compensatory damages from Defendant Estate of Jeffrey Epstein in such sums as a jury would find fair, just, and adequate, and Plaintiffs are further entitled to punitive and exemplary damages from Defendant Estate of Jeffrey Epstein in such sums as a jury would find fair, just, and appropriate to deter said defendant and others from future similar misconduct.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## SECOND CAUSE OF ACTION
### Violation of GMVA: Enabling Gender-Motivated Violence
### *(NYC Admin. Code § 10-1101 et seq.)*
### *As Against Defendant Leslie Herbert Wexner*

149.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein, inclusive, with the same force and effect as if hereinafter set forth at length.

150.     Under the GMVA, a person enables gender-motivated violence when they provide substantial assistance or support to another person in committing a crime of violence motivated by gender.  Enabling includes providing financial resources, property, institutional legitimacy, or other material support that makes the commission of gender-motivated violence possible.

151.     In violation of the GMVA, Defendant Leslie Herbert Wexner enabled Jeffrey Epstein's acts of gender-motivated violence against Plaintiffs in the following ways: providing Epstein with approximately $200 million or more between 1987 and 2007, which Epstein used to operate his sex trafficking network, pay victims, compensate recruiters, and maintain the appearance of wealth and legitimacy; transferring control of the property located at 9 East 71st Street, New York, New York to Epstein, which served as the location where both Plaintiffs were sexually assaulted; granting Epstein full power of attorney over his personal finances in July 1991, which remained in place for approximately sixteen years and gave Epstein authority to control hundreds of millions of dollars with virtually no oversight; appointing Epstein to positions of authority within The Wexner Foundation and other Wexner-controlled entities, which provided Epstein with institutional legitimacy and the appearance of being a respected businessman; and allowing Epstein to use Wexner's association with Victoria's Secret to recruit young women and girls by misrepresenting his role and influence.

36

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 1

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 06/25/2026

Case 1:26-cv-06142    Document 1-1    Filed 07/20/26    Page 39 of 44

152. Defendant Wexner knew or should have known of Epstein's pattern of sexually abusing women and minor girls. In May 1996, Maria Farmer was sexually assaulted by Epstein and Ghislaine Maxwell on Wexner's own property in Ohio and was held against her will for twelve hours by Wexner's security personnel. In the mid-1990s, Wexner's own executives at Victoria's Secret informed him that Epstein was misusing Wexner's name and the Victoria's Secret brand to recruit women by falsely portraying himself as a talent scout. In January 2003, Wexner signed Epstein's 50th birthday book with a drawing of a pair of breasts, demonstrating awareness of Epstein's sexual character. In 2008, four days before Epstein pleaded guilty to solicitation of a minor, Wexner sent Epstein an email expressing sympathy and characterizing Epstein's crime as merely violating the rule to "always be careful." Virginia Roberts Giuffre testified under oath that Wexner himself participated in the sex trafficking operation by having sex with her on multiple occasions. In July 2019, Wexner was named on an FBI list of Epstein's co-conspirators.

153. Despite these warnings and direct evidence of Epstein's crimes, Defendant Wexner made a conscious choice to continue providing Epstein with financial resources, property, power of attorney, and institutional support. Wexner's relationship with Epstein was not passive. It was an active partnership in which Wexner provided the infrastructure that made Epstein's sex trafficking operation possible, and Wexner benefitted by maintaining his relationship with Epstein, who managed his personal finances and business dealings.

154. But for Defendant Wexner's enabling conduct, Plaintiffs would not have been harmed. Without Wexner's money, Epstein could not have operated a sex trafficking network. Without Wexner's property at 9 East 71st Street, Epstein would not have had the location where he sexually assaulted Plaintiffs. Without Wexner's institutional support, Epstein would not have had the appearance of legitimacy that disarmed his victims.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

39 of 44

155.     As a direct and proximate result of Defendant Wexner's violations of the GMVA, Plaintiffs have sustained in the past, and will continue to sustain in the future, physical injury, pain and suffering, serious and severe psychological and emotional distress, mental anguish, embarrassment and humiliation.

156.     As a direct and proximate result of Defendant Wexner's violations of the GMVA, Plaintiffs have incurred medical expenses and other economic damages, and continue to be in physical pain and suffering, and will now be obligated to expend sums of money for medical care and attention in an effort to cure themselves of their injuries and to alleviate their pain and suffering, emotional distress, mental anguish, embarrassment and humiliation.

157.     By reason of the foregoing, Plaintiffs are entitled to compensatory damages from Defendant Wexner in such sums as a jury would find fair, just, and adequate, and Plaintiffs are further entitled to punitive and exemplary damages from Defendant Wexner in such sums as a jury would find fair, just, and appropriate to deter said defendant and others from future similar misconduct.

158.     Plaintiffs also seek injunctive and declaratory relief and reasonable attorneys' fees and costs as provided under the GMVA.

**THIRD CAUSE OF ACTION**
**Violation of GMVA: Enabling Gender-Motivated Violence**
**(NYC Admin. Code § 10-1101 et seq.)**
***As Against Defendants Nine East 71st Street Corporation and The Wexner Foundation***

159.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein, inclusive, with the same force and effect as if hereinafter set forth at length.

160.     In violation of the GMVA, Defendant Nine East 71st Street Corporation enabled Jeffrey Epstein's acts of gender-motivated violence against Plaintiffs in the following ways:

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

owning and managing the property located at 9 East 71st Street, New York, New York, which served as the location where both Plaintiffs were sexually assaulted; providing and maintaining household staff who facilitated victim access by opening doors, escorting victims through the residence, and creating an appearance of legitimacy; furnishing the property with massage rooms, massage tables, showers, baby oil, towels, and other supplies used in the assaults; and providing the infrastructure that allowed Epstein to operate a systematic sex trafficking enterprise at the property. Jeffrey Epstein served as Chief Executive Officer of Defendant Nine East 71st Street Corporation and acted within the scope of his employment when he committed acts of gender-motivated violence against Plaintiffs.

161.    In violation of the GMVA, Defendant The Wexner Foundation enabled Jeffrey Epstein's acts of gender-motivated violence against Plaintiffs in the following ways: employing Epstein as a trustee and director from approximately 1992 to 2008, which provided him with institutional legitimacy and the appearance of being a respected philanthropist; paying Epstein substantial funds, including portions of the approximately $200 million he received from Wexner, which he used to operate his sex trafficking network and commit acts of gender-motivated violence against Plaintiffs; appointing Epstein to positions of authority that he used to gain victims' trust and disarm their defenses; and providing office space and administrative support, including the scheduling system operated by Epstein's assistant "Leslie," which was used to arrange appointments with victims including Plaintiffs.

162.    Defendants Nine East 71st Street Corporation and The Wexner Foundation had knowledge of Epstein's gender-motivated violence through their officers, directors, and controlling shareholders, including Defendant Leslie Herbert Wexner, who owned, managed, and controlled both corporate entities. The knowledge imputed to these corporate defendants includes

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1    Case 1:26-cv-06142    Document 1-1    Filed 07/20/26    Page 42 of 44    RECEIVED NYSCEF: 06/25/2026

all of the warnings, complaints, and direct evidence of Epstein's crimes that were known to Wexner, including the 1996 assault on Wexner's Ohio property, the mid-1990s warnings from Victoria's Secret executives, the 2008 email exchange, the birthday book entry, the Giuffre testimony, and Wexner's inclusion on the FBI co-conspirator list.

163. Despite this knowledge, Defendants Nine East 71st Street Corporation and The Wexner Foundation made a conscious choice to continue providing Epstein with property, staff, institutional positions, and financial resources. These corporate defendants benefitted from their relationship with Epstein by maintaining the goodwill and business relationship of Defendant Wexner, who controlled both entities and whose personal interests they served.

164. But for Defendants Nine East 71st Street Corporation and The Wexner Foundation's enabling conduct, Plaintiffs would not have been harmed. Without Nine East 71st Street Corporation's provision of the property and staff, Epstein would not have had the location and infrastructure to sexually assault Plaintiffs. Without The Wexner Foundation's employment of Epstein and payment of funds, Epstein would not have had the institutional legitimacy and financial resources to operate his sex trafficking network.

165. As a direct and proximate result of Defendants Nine East 71st Street Corporation and The Wexner Foundation's violations of the GMVA, Plaintiffs have sustained in the past, and will continue to sustain in the future, physical injury, pain and suffering, serious and severe psychological and emotional distress, mental anguish, embarrassment and humiliation.

166. As a direct and proximate result of Defendants Nine East 71st Street Corporation and The Wexner Foundation's violations of the GMVA, Plaintiffs have incurred medical expenses and other economic damages, and continue to be in physical pain and suffering, and will now be obligated to expend sums of money for medical care and attention in an effort to cure themselves

40

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

of their injuries and to alleviate their pain and suffering, emotional distress, mental anguish, embarrassment and humiliation.

167.    By reason of the foregoing, Plaintiffs are entitled to compensatory damages from Defendants Nine East 71st Street Corporation and The Wexner Foundation in such sums as a jury would find fair, just, and adequate, and Plaintiffs are further entitled to punitive and exemplary damages from said defendants in such sums as a jury would find fair, just, and appropriate to deter said defendants and others from future similar misconduct.

168.    Plaintiffs also seek injunctive and declaratory relief and reasonable attorneys' fees and costs as provided under the GMVA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray judgment be entered in their favor against Defendants, and each of them, as follows:

i.    For a money judgment representing compensatory damages including medical expenses, therapy costs, lost wages, and all other consequential damages, with interest;

ii.    For a money judgment for mental pain and anguish and severe emotional distress;

iii.    For punitive and exemplary damages;

iv.    For statutory damages as provided under the Gender-Motivated Violence Protection Act;

v.    For attorneys' fees and costs as provided by statute;

vi.    For prejudgment and post-judgment interest; and

vii.    For such other and further relief as the Court may deem just and proper.

### [SIGNATURE PAGE TO FOLLOW]

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 1    Case 1:26-cv-06142    Document 1-1    Filed 07/20/26    Page 44 of 44    INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 06/25/2026

## JURY DEMAND

Plaintiffs demand a trial by jury for all issues so triable.

Dated: June 25, 2026
New York, New York

**GODDARD LAW PLLC**

By: _____
Lindsay M. Goldbrum, Esq.
Megan S. Goddard, Esq.
Hailey Miller, Esq.
*Attorneys for Plaintiffs*
39 Broadway, Suite 1540
New York, NY 10006
Lindsay@goddardlawnyc.com
Megan@goddardlawnyc.com
Hailey@goddardlawnyc.com

42

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.